675 So.2d 403 (1996)
Ex parte CENTRAL BANK OF THE SOUTH.
(Re Catherine J. LACKEY, et al. v. CENTRAL BANK OF THE SOUTH, et al.)
1940086.
Supreme Court of Alabama.
February 23, 1996.
*404 Sterling G. Culpepper, Jr. and Donald R. Jones, Jr. of Balch & Bingham, Montgomery, Davis Carr of Pierce, Carr & Alford, P.C., Mobile, Michael L. Edwards and Teresa G. Minor of Balch & Bingham, Birmingham, for Petitioner.
Norman J. Gale, Jr. of Clay, Massey & Gale, P.C., Mobile, and Patrick H. Sims of Cabaniss, Johnston, Gardner, Dumas & O'Neal, Mobile, for Catherine J. Lackey.
COOK, Justice.
Central Bank of the South ("Central Bank")[1] petitions this Court for a writ of mandamus directing the Mobile County Circuit Court to vacate an order certifying a class in an action commenced against it by Catherine J. Lackey, or, in the alternative, to narrow the scope of the class. We grant the petition in part and deny it in part.
On October 28, 1991, Catherine Lackey purchased jointly with her husband, James H. Lackey, from Central Bank a one-year $10,000 certificate of deposit ("CD") yielding 5.875% interestthe prevailing "market rate" of interest for CDs of such "term and balance." Accompanying the CD was a "certificate of deposit disclosure statement," which contained the following pertinent language:
"CERTIFICATE MATURITY
"By acceptance of this certificate of deposit the depositor contracts to keep the funds represented thereby on deposit until the maturity date shown on the certificate. At maturity the certificate will either be:
"(1) Non-renewable and will become a non-interest-bearing savings deposit; or
"(2) Automatically renewed unless the bank sends written notice to the contrary at least ten (10) days prior to maturity, or the certificate is presented by the depositor for payment upon or within ten (10) days after maturity.
"The specific option for your certificate of deposit is indicated on the face of this certificate."
Lackey's CD was designated on its face "automatically renewable."
In October 1992, Lackey received a "maturity renewal notice," which stated in pertinent part:
"DEAR CUSTOMER, ON THE DATE SHOWN BELOW YOUR CERTIFICATE OF DEPOSIT MATURES AND WILL BE AUTOMATICALLY RENEWED IN ACCORDANCE WITH THE TERMS OF *405 OUR AGREEMENT. WHEN YOUR CERTIFICATE MATURES, YOU WILL RECEIVE ANOTHER NOTICE EXPLAINING THE RENEWAL TERMS AND RATE. YOU HAVE UP TO 10 DAYS AFTER THE MATURITY DATE TO REDEEM THE CERTIFICATE WITHOUT PENALTY IF YOU PREFER OTHER RENEWAL TERMS.
 "*DETAIL INFORMATION*
"JAMES H. LACKEY CERTIFICATE XXX-XXXXXXX
"OR CATHERINE J LACKEY ISSUE DATE 10/28/91
"... MATURITY DATE 10/28/92
"... MATURITY VALUE 10,587.79
 RENEWAL RATE .........."
After the maturity date, the Lackeys received "another notice, purporting to confirm that renewal, but stating that the renewed CD would bear a lower interest rate of 3.55%." Response to Petition for Writ of Mandamus, at 5. This notice, in addition to setting out the renewal terms and the interest rate of 3.55%, also informed the Lackeys that if they were dissatisfied with the terms of the renewal, they could redeem their CD without penalty.
Although the Lackeys declined to redeem their CD, they objected to the reduced rate, contending, essentially, that the terms of the certificate of deposit disclosure statement guaranteed them an interest rate of not less than the initial rate of 5.875%. Central Bank insisted that the Lackeys were entitled only to the market rate of interest prevalent at the time of the renewal3.55%.
On April 29, 1993, Catherine Lackey sued Central Bank, alleging that the Bank's renewing her CD at the then-prevailing market rate of interest of 3.55%, instead of renewing it at 5.875%, constituted a breach of the contract. Otherwise stated, her theory of recovery was that she had "complied with [her] obligation under the deposit agreement by leaving [her] money on deposit with the Bank, but [that] the Bank [had] repudiated and attempted to unilaterally modify the contract by paying a lower rate on renewal." Response to Petition for Writ of Mandamus, at 6. Lackey sued on behalf of herself and "all holders ... of automatically renewable Central Bank certificates of deposit which [had] been renewed one or more times during the [previous] six years ... at an interest rate lower than the interest rate stated on the certificates ... or guaranteed by the terms of the contract controlling the renewal rate." She subsequently amended her complaint to define the putative class as follows:
"All persons or entities who purchased certificates of deposit from Central Bank, where (1) the purchase was made between June 1, 1989, and June 9, 1993, inclusive; (2) the certificate of deposit was automatically renewable; (3) the certificate of deposit was automatically renewed; and (4) as a result of downward adjustment in the interest rate at renewal, the certificate holder earned during renewal periods an amount of interest less than the amount of interest that would have been earned had the certificate been renewed at the original interest rate."
She sought compensatory damages in the amount of $246.16.
On January 31, 1994, the trial court issued an order stating: "Plaintiff's motion for class certification, heard and submitted on January 28, 1994, is granted. Defendant's motion for summary judgment, heard and submitted on January 28, 1994, is denied." On February 9, 1994, Central Bank filed a "motion to reconsider class certification or in the alternative for other relief," asserting, among other things, that "at least as early as August 1991," Central Bank was issuing CD disclosure statements stating in pertinent part:
"CERTIFICATE MATURITY
"By acceptance of this certificate of deposit the depositor contracts to keep the funds represented thereby on deposit until the maturity date shown on the certificate. At maturity the certificate will either be:
"(1) Non-renewable and will become a non-interest-bearing savings deposit; or

*406 "(2) Automatically renewed at bank's prevailing interest rate for new certificates of deposit with the same term and balance, unless the bank sends written notice to the contrary at least ten (10) days prior to maturity, or the certificate is presented by the depositor for payment upon or within ten (10) days after maturity."
(Emphasis added.) The emphasized phrase, Central Bank contends, precludes claims like Lackey's as to any depositor whose CD disclosure statement contained it. In its "motion to reconsider," Central Bank argued:
"Plaintiff[s'] counsel [has] estimated that their damages are approximately $40 million. If notice is sent to tens of thousands of Central's depositors, Central may be injured irreparably by losing customers and business, regardless of whether it ultimately prevails on the merits. Even if Central ultimately were proven correct, it would be unfairly prejudiced by having such allegations sent to the homes of thousands of its customers."
On June 17, 1994, Lackey filed a "motion for approval of class notice," in which she requested "an order approving a Notice for distribution to the class certified." On July 11, 1994, Central Bank requested "an evidentiary hearing on the issue of class certification." On September 21, 1994, the trial court denied Central Bank's motion, stating: "The Court determines that the ends of Justice will best be served by notifying all CD holders in the class as presently constituted and then determining which, if any, hold certificates with a difference that would preclude liability." The following day, the court granted Lackey's "motion for approval of class notice." Central Bank then petitioned this Court for a writ of mandamus directing the trial court to vacate its order "certifying the plaintiff's action as a class action, or in the alternative, to narrow the scope of the class in light of evidence and arguments presented by Central Bank to the trial court."

I. Central Bank's Request for Decertification
This action was certified as a class action pursuant to Ala.R.Civ.P. 23(a) and (b)(3). Rule 23(a) requires the following findings:
"(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class."
In opposition to the trial court's certification of a plaintiff class, Central Bank contends that the requisite findings were not made. More specifically, it argues that Lackey lacks standing to represent the putative class. She lacks standing because, it argues, she has failed to "demonstrate that there was [a] material breach of the agreement by Central Bank." Petition for Writ of Mandamus, at 17. Because "Lackey's underlying claim for breach of contract is unfounded," Central Bank insists, this "action is not a proper case for class certification." Id.
The essence of Central Bank's argument is that the trial court erred in denying its motion for a summary judgment. However, "[w]e have ... stated on numerous occasions that mandamus cannot be used as a substitute for appeal." Ex parte Stone, 502 So.2d 683, 685 (Ala.1986); see also Ex parte Jackson, 614 So.2d 405, 408 (Ala.1993). Thus, a writ of mandamus will not issue to review the merits of an order denying a motion for a summary judgment. Ex parte Gatwood, 518 So.2d 115, 116 (Ala.1987); Ex parte Newco Mfg. Co., 481 So.2d 867, 870 (Ala.1985); Ex parte South Carolina Ins. Co., 412 So.2d 269, 270 (Ala.1982).
Whether the "underlying claim for breach of contract is unfounded" is an issue that may be addressed on appeal. Therefore, we will not consider under a request for decertification arguments that essentially invite us to review indirectly a ruling on the merits of the underlying claim.

II. Overbreadth
Central Bank also contends that the class as certified by the trial court is overbroad. In this connection, its "standing" argument rests on better ground, for "[t]he *407 definition of a class cannot be so broad that it includes persons without standing to bring the action on their own behalf. Each class member must have standing to bring the suit in his own right." Slaughter v. Levine, 598 F.Supp. 1035, 1041 (D.Minn.1984) (emphasis added), aff'd, 801 F.2d 288 (8th Cir.1986), rev'd sub nom. on other grounds, Gardebring v. Jenkins, 485 U.S. 415, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988); see also Rios v. Marshall, 100 F.R.D. 395, 407 (S.D.N.Y.1983) ("class definition ... should be limited to those individuals who were adversely affected by the practices of which the named plaintiffs complain").
In its mandamus petition, Central Bank states that the class as currently constituted includes at least 47,172 CD customers, of whom approximately 9557 received disclosure statements containing the phrase "at bank's prevailing interest rate for new certificates of deposit with the same term and balance." A properly constituted class, Central Bank insists, could not include customers whose CD disclosure statements actually contained the phrase that Lackey alleges should have been contained.
We agree with this contention. In so stating, we are not to be understood as invading the role of the trial court in matters involving its discretion, First Alabama Bank v. Martin, 381 So.2d 32, 35 (Ala.1980), for a customer whose contract does not suffer the deficiency alleged to form the basis of this action, could not, as a matter of law, maintain such an action "in his own right." Slaughter v. Levine, 598 F.Supp. 1035, 1041 (D.Minn. 1984).
In stating that "the ends of Justice will best be served by notifying all CD holders in the class as presently constituted and then determining which, if any, hold certificates with a difference that would preclude liability" (emphasis added), the trial court tacitly expressed a desire to develop a more complete record before revisiting its certification order. This concern is not entirely without merit, for, at this point in the proceedings, the only evidence presented as to the number of customers to whom Lackey's claim does not apply has been the affidavit testimony of Central Bank's vice-president, Thomas E. Bishop. However, the precise number of customers to whom Bishop referred will readily be available from Central Bank's computers. Moreover, it will serve no legitimate purpose to tell nearly 10,000 Central Bank customers of the pendency of an action in which theyunder the theory of this casecannot participate.[2]
The trial court is directed, therefore, to vacate its class designation to the extent that it includes such customers as Central Bank shall demonstrate, through the production of its relevant records, received CD disclosure statements containing the clause "at bank's prevailing interest rate for new certificates of deposit with the same term and balance," and to vacate its certification order to the extent that it requires notice to such customers. To this extent, Central Bank's petition seeking to narrow the scope of the class is granted. To the extent the petition seeks decertification of the class action, it is denied.
PETITION GRANTED IN PART AND DENIED IN PART.
HOOPER, C.J., and MADDOX and INGRAM, JJ., concur.
KENNEDY, J., concurs in the result.
BUTTS, J., concurs in part and dissents in part.
HOUSTON, J., recuses.
*408 BUTTS, Justice (concurring in part and dissenting in part).
I respectfully dissent from the majority opinion insofar as it denies Central Bank's request for an order directing the trial court to vacate its order certifying the plaintiff class. I would grant the writ. However, given the majority's ruling on that issue, I concur with the majority's order directing the trial judge to narrow the scope of the plaintiff class.
NOTES
[1] Central Bank is now known as "Compass Bank." In the trial court, however, as well as in the mandamus petition, it was called Central Bank. For the sake of consistency, we shall refer to the petitioner as Central Bank throughout this opinion.
[2] Central Bank also contends that the trial court's certification can be construed so broadly as to "include individuals whose CDs [were] renewed after June 9, 1993, but were purchased during the period of June 1, 1989 to June 9, 1993." Petition for Writ of Mandamus, at 6 n. 9. This construction would, Central Bank argues, include "an individual who purchased a CD with a term of 15 years on June 9, 1993, and who renews his CD on June 9, 2008, at a lower rate of interest." Id. (Emphasis added.)

However, such a construction is unnatural and would lead to difficulty, if not impossibility, in application. We construe the language in its natural sense, namely, as including only those customers whose purchases of automatically renewable CDs were "made between June 1, 1989, and June 9, 1993," and whose CDs were actually renewed between June 1, 1989, and June 9, 1993, at a lower rate of interest than the "original interest rate."